# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARITZA BOLLAS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09 C 1214** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Morton Denlow** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Maritza Bollas ("Claimant") brings this action under 42 U.S.C. § 405(g),

seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner

of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for

Title II Disability Insurance Benefits ("DIB") and Title XVI Supplement Security Income

("SSI"). The parties raise the following issues: (1) whether Claimant waived her claim that

she was disabled by physical impairments; (2) whether the Administrative Law Judge's

("ALJ's") physical Residual Functional Capacity ("RFC") determination is supported by

substantial evidence; and, (3) whether the ALJ's mental RFC determination is supported by

substantial evidence. For the following reasons, the Court affirms the ALJ's decision

denying Claimant's DIB and SSI benefits, denies Claimant's request to reverse or remand

the decision of the Commissioner, and grants the Commissioner's motion for summary

judgment.

# I. BACKGROUND FACTS

## A. Procedural History

Claimant initially filed for DIB on September 2, 2003, and for SSI on August 14, 2003, alleging a disability onset date of December 4, 2002 due to bilateral carpal tunnel syndrome, an elbow impairment, and depression. R. 165-67. The Social Security Administrator ("SSA") denied both claims on December 17, 2003. R. 149. Claimant then filed a request for reconsideration, which the SSA denied on September 22, 2004. R. 155. Shortly thereafter, on November 17, 2004, Claimant requested a hearing before an ALJ. R. 161. Claimant's hearing was postponed on several occasions before going forward in June 2007. R. 37, 879-82.

On June 15, 2007, Administrative Law Judge Helen Cropper presided over a hearing at which Claimant appeared with her attorney, Paul Marcovitch. R. 884-956. Claimant, Dr. William Newman, a medical expert, and Cheryl Hoiseth, a vocational expert, testified at the hearing. R. 884. On August 27, 2007, the ALJ rendered a detailed decision finding Claimant was not disabled under the Social Security Act. R. 31-60. Specifically, the ALJ found that, "considering the claimant's age, education, work experience, and physical and mental RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 59.

Claimant then filed for a review of the ALJ's decision to the Appeals Council. R. 25. On September 24, 2008, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 10-12. Claimant subsequently filed this action for

review pursuant to 42 U.S.C. § 405(g).

**B.      Hearing Testimony - June 15, 2007**

      **1.      Maritza Bollas - Claimant**

At the time of the hearing, Claimant was forty-eight years old and unmarried.  R. 895-96.  Claimant completed education through the twelfth grade and has past relevant work experience as a production worker for a frozen food company.  R. 898-901.  In addition to production work, Claimant's prior work experience included welding and soldering at a manufacturing facility.  R. 905.  Claimant speaks, reads and writes in Spanish, but speaks very little English and has a rudimentary ability to read or write in English.  R. 899. During the hearing, Claimant spoke through a Spanish-speaking interpreter.  R. 886.  Claimant testified through the interpreter that she resigned from her job as a production worker on December 4, 2002 after experiencing worsening pain in her elbow, hands and neck.  R. 901, 903-04.  Claimant's pain originated from an accident at work on March 14, 2002, where she banged her left elbow on a metal tray.  R. 903-04.  Claimant is left-handed.  R. 908.

During the hearing, Claimant explained that carpel tunnel syndrome, pain and numbness in her left and right elbows, hands and wrists, as well as pain in her neck, have prevented her from working.  R. 909, 927-28.  Following her work-related injury in March 2002, Claimant's pain became so severe that she consulted a doctor who recommended that she refrain from returning to work until she had carpal tunnel release surgery.  R. 904.  Claimant has yet to have the recommended carpal tunnel release surgery, but received surgery on her left elbow on October 31, 2002 and again on February 15, 2005, from which

she states she received no benefit.  R. 909-11.  In addition, Claimant testified that doctors gave her multiple steroid injections in her left elbow, physical therapy, and prescribed pain medications.  R. 909-17.  Even with pain medications, Claimant asserts she continues to experience pain in her upper extremities and frequently has problems doing everyday tasks such as lifting a gallon of milk, signing her name, and dressing herself.  R. 917-18, 926, 928.

Additionally, Claimant states that she currently suffers from depression, sleeplessness, and loneliness as a result of her inability to return to work.  R. 913, 918.  Claimant began seeing a mental health professional in November 2004.  R. 918.  Since 2004, Claimant has taken Wellbutrin, Amitriptyline, and Prozac, among other things, to remedy the effects of her depression.  R. 919, 923.  Claimant asserted that depression has isolated her from others, including her children, and that she no longer has "trust in anybody."  R. 920, 924-26, 929.  Further, Claimant testified that although she sees her two oldest children, as well as one grandchild, several times a week, she only sees her youngest children on vacations and holidays, maintains only one friendship, and does not engage in any social activities.  R. 921, 924-25, 930-32.

### 2.    Dr. William Newman - Medical Expert

After reviewing Claimant's medical record, the Medical Expert ("ME"), Dr. William Newman, an orthopedic specialist, opined that Claimant did not suffer from significant physical impairments and that Claimant had the physical Residual Functional Capacity

("RFC")[1] to perform a full range of light work. R. 887, 935-36. Although the medical record indicated a minor slowing of sensory nerve conduction in the nerves on Claimant's left and right side, the ME testified that the medical record failed to show any clinical signs of real carpel tunnel syndrome, cubital tunnel syndrome, or ulnar neuropathy. R. 935. The ME concluded that Claimant's physical impairments did not meet or equal a listed impairment for musculoskeletal or neurological impairments. R. 936.

The ME concluded that Claimant's problems were not physical and stated that he could not find "any anatomical basis for her physical complaints." R. 936, 938. Rather, the ME testified that Claimant's physical injuries were either a direct "confabulation or imagination." R. 938. The ME noted that Claimant appeared to be miserable and depressed, and that he typically sees claims of aches and pains in women around Claimant's age who have social problems. R. 937, 939. However, when asked by Claimant's counsel whether Claimant's pain symptoms were psychosomatic or a result of malingering, the ME stated that he would give Claimant "the benefit of the doubt." R. 938-39.

### 3. Cheryl R. Hoiseth - Vocational Expert

The Vocational Expert ("VE"), Cheryl R. Hoiseth, described Claimant's past relevant work as a production worker, in which Claimant did hand-packaging on an assembly line, as medium, unskilled work. R. 941. The VE also described Claimant's prior work in welding and soldering as light, unskilled work. *Id.* The VE opined that Claimant could not

---

[1]Residual Functional Capacity determines the extent that a claimant can do despite the effects of her impairments. 20 C.F.R. § 404.1545(a).

perform any of her past work.  R. 942-43.  However, the VE testified that there were other occupations Claimant could perform, such as light packaging (10,800 jobs), assembler (12,800 jobs) or inspector (4,100 jobs), none of which require skilled labor.  *Id.*

## C.    Medical Evidence

### 1.    Evidence of Physical Impairment

#### a.    Dr. Barbara Heller - Claimant's Treating Orthopedist

Claimant sought treatment from Dr. Barbara Heller ("Dr. Heller") from March 2002 to August 2002, following her work-related injury.  R. 289-90, 698.  Dr. Heller initially diagnosed Claimant with severe acute left lateral epicondylitis[2] and recommended occupational therapy with a hand specialist and that Claimant wear a tennis elbow splint at all times.  R. 698.  In a follow-up visit on May 3, 2002, Claimant indicated that physical therapy was working but she continued to experience significant pain.  R. 696.  Dr. Heller gave her a steroid injection in her left elbow for the pain.  *Id.*  Dr. Heller thought Claimant could return to work, but recommended "no work whatsoever with [her] left arm."  R. 697.

Dr. Heller saw Claimant again on May 31, 2002 and noted that Claimant's condition was "absolutely improving."  R. 694.  Claimant had full range of motion in her left elbow and experienced little discomfort in her wrists.  *Id.*  Dr. Heller gave Claimant two additional steroid injections in her left elbow.  *Id.*  On June 14, 2002,  Dr. Heller recommended that Claimant refrain from lifting anything over five pounds and work with both arms for only

---

[2]Lateral epicondylitis is more commonly recognized as "tennis elbow," a common injury to the elbow joint from overuse of the muscles in the forearm that straighten and raise the wrist and hand. Pierre Rouzier, *Lateral Epicondylitis (Tennis Elbow)*, RELAY HEALTH, July 2009.

half of the day.  R. 693.  Thereafter on June 28, 2002, Dr. Heller downgraded Claimant's work restrictions to allow Claimant to use both hands the entire day, while still refraining from lifting anything over five pounds.  R. 691-92.  Nevertheless, Claimant continued to experience pain prompting Dr. Heller to refer Claimant to Dr. Leonard Smith, an orthopedic specialist.  R. 270.

In August 2002, upon request from Dr. Smith, Dr. Heller conducted electromyographic ("EMG") and nerve conduction ("NCV") studies on Claimant.  R. 289-90. Based on the EMG and NVC studies, Dr. Heller concluded that Claimant had moderate demyelinating carpal tunnel syndrome ("CTS") "on her left."  *Id.*

### b.     Dr. Paul Belich - Independent Medical Examiner

Dr. Paul Belich ("Dr. Belich'), an orthopedic surgeon, conducted an independent medical evaluation ("IME") of Claimant in connection with Claimant's workers' compensation claim ("WC") on June 11, 2002.  R. 634-37.  After interviewing and examining the Claimant, as well as reviewing her medical records, Dr. Belich diagnosed Claimant with lateral extensor tendinosis[3] and contusion[4] of the left elbow.  R. 636. However, Dr. Belich noted that Claimant should be "well on her way to recovering from this injury."  *Id.*  Dr. Belich believed that after four to six weeks of conservative treatment, Claimant should be able to return to work without restrictions.  *Id.*

---

[3]The more common term for lateral extensor tendinosis is tennis elbow.  *See* Rouzier, *supra* note 2.

[4]Contusions are more commonly referred to as bruising or discoloration of skin caused by the escape of blood from underlying blood vessels following an injury.  *Bruise*, RELAY HEALTH, July 2009.

On September 23, 2002, Dr. Belich provided a supplemental written report upon request from Claimant's employer concerning Dr. Leonard Smith's recommendation that Claimant receive carpal tunnel release surgery. R. 632-33. Without re-examining Claimant, but following a review of Claimant's medical records, Dr. Belich concluded that Claimant's medical records did not support a diagnosis of carpel tunnel syndrome or a need for carpal tunnel surgery. *Id*. Dr. Belich recommended continuing physical therapy, opining that Claimant should be able to achieve "maximum medical improvement" in four to six weeks. R. 633.

### c. Dr. Leonard Smith - Claimant's Treating Orthopedic Surgeon

Claimant sought treatment from Dr. Leonard Smith ("Dr. Smith") from July 2002 to December 2002. R. 296, 680. After an initial examination, Dr. Smith ordered an MRI to determine whether Claimant was a candidate for surgical release of the extensor muscles in her left elbow. R. 296. At the time, Claimant was still working, but only using her right arm. *Id*. The results of the MRI indicated minimal prominence of fluid in the left elbow joint, with the remainder of the results within the normal limits. R. 233. Dr. Smith also ordered EMG and NCV studies, which ruled out cervical disc problems. R. 290, 294. Dr. Smith noted that the EMG and NVC studies indicated evidence of carpel tunnel syndrome, but that this may be related to repetitive work over a period of time rather than a single work injury. R. 294. He nevertheless opined that should Claimant's condition not improve, she should receive surgical release of the extensor muscles in her left elbow as well as CTS release surgery. *Id*.

On October 31, 2002, Dr. Smith performed a synovectomy (surgical removal of the inflamed lining) and tendon release of the left radiohumeral (elbow) joint in an outpatient procedure. R. 236-37, 682. In a follow-up visit on November 22, 2002, Dr. Smith recommended Claimant continue physical therapy but stated she could return to work with limited use of her left arm. R. 681. Claimant last saw Dr. Smith on December 6, 2002, at which time he continued to opine Claimant could return to work with limited use of her left arm. R. 680.

### d. Union Medical Center - Claimant's Physical Therapy

Claimant sought treatment at Union Medical Center ("Union") for physical therapy from October 2002 to February 2003. R. 306-09. On October 14, 2002, Claimant visited Union complaining of lower back pain as well as neck pain and pain in her left ankle. R. 309. On November 8, 2002, Claimant complained of continuing pain in her neck and back, which Union opined might be due to standing in one position at work for long periods of time. R. 307. Claimant was referred to an orthopedic specialist for evaluation. R. 307-08.

### e. Dr. Gabriel Rivera - Claimant's Treating Chiropractor

Claimant sought treatment from Dr. Gabriel Rivera ("Dr. Rivera") beginning on December 4, 2002. R. 327. Claimant complained of constant left elbow pain radiating down to her left hands and fingers, pulsating pain in her right elbow, and numbness and tingling in her right wrist, hand and fingers. R. 326-27. Claimant was taking Ibuprofen and Tylenol for pain control. R. 327. Dr. Rivera diagnosed Claimant with CTS, lateral epicondylitis, and elbow contusion, and recommended continued physical therapy and electrical stimulation to

her elbows and wrists.  R. 327-38.

After continuing complaints of pain, Dr. Rivera referred Claimant to Dr. Bermudez Ruben and Dr. Sarmed G. Elias.  R. 333.  In a follow-up visit on January 7, 2003, Dr. Rivera noted that Claimant had twenty pounds of grip strength in her right hand and zero pounds of grip strength in her left hand.  R. 338.  Dr. Rivera recommended CTS surgery to her left side and steroid injections in her left and right elbows.  *Id.*

### f. Dr. Sarmed G. Elias and Dr. Bermudez Ruben- Claimant's Treating Neurosurgeons

Dr. Sarmed G. Elias ("Dr. Elias") and Dr. Bermudez Ruben ("Dr. Ruben") conducted an evaluation on December 16, 2002.  R. 302.  Claimant complained of pain in both elbows and wrists, as well as pain in her upper arms, with pain radiating into the left cervical region. R. 303.  The doctors diagnosed Claimant with bilateral epicondylitis and CTS and recommended continuing physical therapy.  *Id.*  In a follow-up visit on December 30, 2002, Dr. Elias noted that Claimant continued to complain of pain in both wrists, but could lift twenty-five pounds with her right hand and ten pounds with her left hand.  R. 337.

### g.    Dr. Ira Kornblatt - Independent Medical Examiner

Dr. Ira Kornblatt ("Dr. Kornblatt") conducted an IME of Claimant on June 26, 2003 in relation to Claimant's WC claim.  R. 266.  Claimant complained "bitterly" of pain in her left elbow radiating through her left shoulder, as well as pain and tingling in her left hand and wrist, and discomfort in her right hand, wrist and elbow.  *Id*.  Following an interview and examination of Claimant, as well as a review of Claimant's medical records, Dr. Kornblatt concluded "there [was] a paucity of findings on physical exam to suggest that she has clinical carpel tunnel at this time."  R. 267.  Noting Claimant's chronic pain complaints and diffuse symptomatology, Dr. Kornblatt opined that Claimant would receive no benefit from surgical treatment and he recommended evaluation and treatment at a pain clinic.  *Id*.

### h.    Dr. Margaret Stronska - Independent Medical Examiner

Dr. Margaret Stronska ("Dr. Stronska") conducted an IME on Claimant on October 31, 2003 at the behest of the SSA.  R. 318-22.  Claimant complained of pain in multiple joints including left heel, hip and lower back on standing, and reported a history of bilateral CTS in both wrists.  R. 318-19.  Dr. Stronka noted that Claimant had full range of motion in all joints.  R. 322.

### i.    State Agency Medical Consultants

State agency medical consultants Drs. Edward G. Ference ("Dr. Ference") and Raymond L. Castaldo ("Dr. Castaldo") conducted two RFC assessments on Claimant in December 2003 and September 2004.  R. 488-95.  Both Dr. Ference and Dr. Castaldo concluded that Claimant was capable of lifting or carrying up to ten pounds frequently and twenty pounds occasionally.  R. 489.  In addition, they believed she could stand, walk or sit

up to six hours in an eight-hour workday, and could push or pull with limited functionality in her left upper extremity. *Id.* Dr. Ference and Dr. Castaldo found Claimant had limitations in her ability to balance herself due to limits in her "hand grasp." R. 490. They also concluded that Claimant was limited in her ability to reach in all directions, and limited in gross and fine manipulation with her left upper extremity. R. 491. Overall, however, the doctors concluded that Claimant could perform a wide range of light work. R. 488-95.

### j.    Dr. Gerald S. Kane - Orthopedic Surgeon

Dr. Gerald S. Kane ("Dr. Kane") examined Claimant on December 29, 2003. R. 629-32. Dr. Kane diagnosed Claimant with lateral epicondylitis of the left elbow, bilateral CTS, and tendonitis of the left shoulder. R. 631. Dr. Kane believed the lateral epicondylitis and bilateral CTS were a direct result of Claimant's work injury in March 2002. *Id.* The tendonitis was an offshoot of these injuries caused by Claimant's inability to use her left arm properly. *Id.* He recommended CTS release surgery for her wrist and surgery for the lateral epicondylitis of the left elbow, as well as steroid treatment for the tendonitis. *Id.*

### k.    Dr. John O'Keefe - Claimant's Treating Orthopedic Surgeon

Claimant received treatment from Dr. John O'Keefe ("Dr. O'Keefe") from March 2003 to January 2007. R. 274, 805. During Claimant's initial visit, Dr. O'Keefe administered a steroid injection to Claimant's left elbow for pain relief and advised Claimant to abstain from work. R. 274, 368. After additional complaints of pain during a follow-up visit, Dr. O'Keefe recommended Claimant receive outpatient nerve release surgery on her left arm. R. 286. Dr. O'Keefe noted during follow-up visits that Claimant appeared to be

"miserable." R. 367, 370, 710, 763, 772, 778, 783. Claimant continued over the course of many visits to complain of pain in her hands, wrists and shoulders, as well as additional pain in her neck. R. 315, 709-786. Dr. O'Keefe repeatedly recommended CTS release surgery to both wrists and left cubital release surgery and recommended that Claimant remain off of work until surgery was approved by her insurance provider. R. 316, 370, 772-73, 775-76, 780, 784.

Following approval, Dr. O'Keefe performed left cubital release surgery on Claimant on February 15, 2005. R. 757-59. During a follow-up visit on February 22, 2005, Claimant continued to complain of intense pain from the surgery and Dr. O'Keefe recommended she receive physical therapy. R. 733, 741, 742, 753.

On April 22, 2006, Dr. O'Keefe refused to sign a letter saying Claimant was completely disabled because he believed "there [were] work activities that she could do such as healthcare or infant daycare type activities." R. 798. As late as January 2007, Claimant continued to complain of severe pain in her left and right upper extremities. R. 805-807. Dr. O'Keefe encouraged her to "try and find some duty that would not be heavy and not be terribly repetitive." R. 807.

### l.      Dr. Martin Cohen - Independent Medical Examiner

Dr. Martin Cohen ("Dr. Cohen"), an orthopedic surgeon, conducted an IME on Claimant on March 24, 2006, in connection with Claimant's WC claim, to determine whether Claimant required CTS release surgery. R. 616-27. Claimant reported feeling pain, tingling and numbness in her left and right sides. R. 623. During his examination, Dr. Cohen

observed that Claimant was unable to generate any grip strength in either her left or right hand, noting that "[He had] never actually seen this in [his] practice of 13 years." R. 624. In addition, Claimant had limited ability to passively and actively extend her left and right elbows and forearms, reported pain surrounding the left elbow out of proportion to her diagnosis as well as to the amount of pressure applied, and had "non-physiological weakness" that affected her left upper extremity. R. 624-25.

Although Dr. Cohen thought Claimant suffered from a direct traumatic contusion to her left elbow as a direct result of her work injury, he was unable to specifically diagnose Claimant's condition, noting that she may have CTS, but this would in no way account for the all of her stated symptoms. R. 625. He noted that her myriad symptoms were magnified, and "nonorganic" in nature, and that he was unable to account for discrepancies in active and passive motion and total global sensory loss in the left upper extremity. *Id*. Dr. Cohen could not recommend the requested CTS release surgery and would only recommend physical therapy. R. 626. In addition, Dr. Cohen believed that Claimant was fully able to return to "any job activities that she would like," but recommended she receive a Functional Capacity Evaluation ("FCE"). *Id*. Dr. Cohen stated that there may be "psychological factors" that prevented a full assessment of her functional abilities. *Id*.

### m. Tyson Sanchez - Functional Capacity Evaluation Assessor

Mr. Tyson Sanchez ("Mr. Sanchez"), a certified physical therapist, conducted a baseline FCE of Claimant on October 3, 2006. R. 852. Of the sixteen objective tests that determine whether a patient is performing with maximum effort, Claimant failed twelve,

rendering her evaluation "invalid secondary to the submaximal effort demonstrated by Ms. Bollas during her performance." R. 852, 855-56. Mr. Sanchez concluded that Claimant was able to function at a higher work category than she demonstrated during the examination, but could not fully determine her physical functional capacity given her submaximal effort. R. 853.

### 2.    Evidence of Mental Impairment

#### a.    Ms. Hazel Feliciano - Claimant's Treating Therapist

Claimant sought treatment from Ms. Hazel Feliciano ("Ms. Feliciano"), a therapist and social worker, from December 2004 to August 2006. R. 533-612. Ms. Feliciano described Claimant as having a good memory and as being attentive and alert during the initial two-hour evaluation, but diagnosed her with major depression and moderately severe functional limitations as evidenced by Claimant's Global Assessment of Functioning ("GAF")[5] score of 45. R. 606, 612. Ms. Feliciano referred Claimant for a formal psychiatric evaluation with Dr. Maria Fisfalen, and recommended additional outpatient counseling. R. 612.

Over the next few years, Ms. Feliciano met with Claimant regularly for counseling. R. 574, 576-77, 579-82, 584, 587-88, 590. Throughout her counseling sessions, Claimant complained primarily of frustration due to unemployment and inability to work, and with the

---

[5]The Global Assessment of Functioning Score is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

lack of progress in obtaining social security disability benefits. R. 541-42, 555, 568, 577, 580, 582, 820. On April 10, 2006, Ms. Feliciano downgraded Claimant's diagnosis to a milder form of depression, reflecting a GAF score of 55. R. 549. In April 2006, Ms. Feliciano wrote a letter to Claimant's treating physician Dr. O'Keefe requesting the physician certify Claimant as totally disabled. R. 556, 798. Dr. O'Keefe responded that he was "not comfortable with that." R. 798. On December 20, 2006, Claimant told Ms. Feliciano that she had no suicidal thoughts, was participating in group therapy, and was coping well. R. 812.

On June 21, 2007, Ms. Feliciano completed a mental RFC assessment in connection with Claimant's SSA hearing with the ALJ. R. 17-22. The assessment reflected that Claimant suffers from depression which manifests itself in constant sadness, tearfulness, low energy, low initiative, trouble sleeping, and poor concentration. R. 17. However, any limitations on Claimant's ability to work were attributed to Claimant's physical injury and not to Claimant's depression. R. 17-22. Ms. Feliciano believed Claimant could not perform at a consistent pace without an unreasonable number of rests and would be unable to deal with normal work-related stress; however, she specifically noted that this was due to her physical injury. R. 19. Overall, Ms. Feliciano believed Claimant's mental abilities to perform the demands of work were almost entirely "unlimited or very good." *Id.*

### b. Dr. Maria Fisfalen - Claimant's Treating Psychiatrist

Dr. Maria Fisfalen ("Dr. Fisfalen") performed a psychiatric evaluation of Claimant on February 1, 2005. R. 598. Dr. Fisfalen observed Claimant was cooperative, alert, well

groomed, and tearful, and had a depressed mood. R. 601. Dr. Fisfalen diagnosed Claimant

with Major Depressive Disorder. R. 602. She recommended Claimant enter counseling and

prescribed anti-depressant medication, including increasing her dosage of Prozac, and also

prescribing Abilify and Zoloft, among other drugs. *Id.* According to Dr. Fisfalen's treatment

records, Claimant complained primarily of pain rather than discussing her depressed mood.

R. 558-59, 564, 583, 808-824. Claimant continued to see Dr. Fisfalen for psychiatric

evaluations until June 2007. R. 848.

**D.     The ALJ's Decision - August 27, 2007**

After a hearing and review of the medical evidence, the ALJ determined Claimant has

the physical RFC to perform most light work and the mental RFC to perform and sustain

simple, repetitive unskilled work. R. 37-60. The ALJ evaluated Claimant's application

under the required five-step sequential analysis. R. 40-60. At step one, the ALJ found

Claimant had not engaged in substantial gainful activity since December 4, 2002, the alleged

onset date. R. 40-41. At step two, the ALJ determined that Claimant had severe impairments

with a history of elbow injury, CTS, and depression. R. 41. At step three, the ALJ found

Claimant did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 41-42.

The ALJ then considered Claimant's physical RFC and found Claimant capable of

performing most light work,[6] except she should not do constant repetitive pushing or pulling

---

[6]Light work is defined as lifting, carrying, pushing and/or pulling up to twenty pounds occasionally and up to ten pounds frequently. R. 42.

against resistance with the dominant left upper extremity, climb ladders, ropes or scaffolds or work on moving or unstable surfaces, and should not perform work that would expose her to unprotected heights or unguarded hazardous equipment. R. 42-43. The ALJ also considered Claimant's mental RFC and found Claimant capable of performing and sustaining simple, repetitive unskilled work,[7] with pain, numbness and depression distracting Claimant only rarely during the workday. R. 43. In addition, after reportedly considering all relevant evidence, including Claimant's testimony, the ALJ found Claimant's medically determinable impairments could not reasonably be expected to produce the intensity, persistence or limiting effects alleged by Claimant. R. 57-58.

At step four, the ALJ concluded Claimant could not perform her past relevant work as a hand packer and welder and solderer. *Id.* At step five, the ALJ considered Claimant's age, education, work experience, and physical and mental RFC, and found that a significant number of jobs exist in the national economy that Claimant can perform, including hand packer,[8] assembler, and inspector. R. 58-59. Therefore, the ALJ concluded Claimant was not disabled under the Social Security Act. R. 60.

## II.  LEGAL STANDARDS

### A.    Standard of Review

---

[7]Simple, repetitive and unskilled work requires an ability to understand, remember and carry out simple instructions, respond appropriately to supervisors, coworkers and usual work situations, and deal with changes in a routine work setting. R. 43.

[8]The ALJ notes in her decision that while Claimant's prior employment as a hand packer required a medium level of exertion, the position of hand packer can also be performed at a light exertional level. R.58.

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review

is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.      Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(I-v). Under this process, the ALJ must inquire, in the following order: 1) whether the claimant is engaged in substantial gainful activity; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a listed impairment; 4) whether the claimant can perform past relevant work; and 5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven she

cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

The parties raise the following issues: (1) whether Claimant waived her claim that she was disabled by physical impairments, (2) whether the ALJ's physical RFC determination is supported by substantial evidence; and (3) whether the ALJ's mental RFC determination is supported by substantial evidence.

### A. Claimant Has Waived Her Claim That She Is Disabled By Physical Impairments.

In her initial brief, Claimant did not contest the ALJ's decision denying Claimant disability benefits on the basis that Claimant had the physical RFC to perform light work, but instead only took issue with the ALJ's decision regarding Claimant's mental impairment. Issues not raised in a claimant's initial brief are generally waived for purposes of review. *Jones v. Shalala*, 10 F.3d 522, 525 n. 4 (7th Cir. 1993). In her reply brief, Claimant argues that the physical impairment argument was sufficiently raised in the fact section of her brief, in which Claimant discusses her work-related physical injury, her post-injury treatments, and her two elbow surgeries. However, Claimant's mere mention of facts pertinent to a claim of physical impairment does not qualify as having raised an issue. *See DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archeologist with the record."); *Central States, Southeast*

*and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) (arguments not developed in any meaningful way are waived). The only relief requested in Claimant's initial brief was reversal and remand of the ALJ's decision to allow for new medical expert testimony concerning Claimant's mental impairment. Claimant made no request for relief from the ALJ's ruling regarding her physical impairment. Failing to find any argument or request for relief contesting the ALJ's decision regarding Claimant's physical impairments in her initial brief, this argument is forfeited. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009).

**B.     The ALJ Had Substantial Evidence To Support Her Physical RFC Determination.**

Notwithstanding Claimant's waiver of her claim that she was physically disabled, the ALJ's physical RFC finding is nevertheless supported by substantial evidence. An ALJ makes a physical RFC determination by weighing all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, she must determine what weight to give the opinions of the claimant's treating physicians, state agency reviewers, and medical experts. 20 C.F.R. § 404.1527(d); SSR 96-2p.

The ALJ considered the opinion of Dr. O'Keefe, Claimant's treating orthopedic surgeon, who concluded that Claimant was capable of performing "non-repetitive" light work. R. 54. The ALJ noted that Dr. O'Keefe initially provided multiple work excuse forms for Claimant saying she could not return to work, but, in the latter course of Claimant's treatment, Dr. O'Keefe opined that Claimant could perform "non-repetitive" light work. *Id.*

In addition, the ALJ's decision notes that Dr. O'Keefe was not comfortable signing a letter written by Claimant's therapist, Ms. Feliciano, declaring Claimant totally disabled, but rather, he believed her capable of performing jobs such as home healthcare and infant daycare. R. 49. Dr. O'Keefe's opinion as to Claimant's ability to perform light work constituted substantial evidence in support of the ALJ's decision.

In reaching her conclusion regarding Claimant's physical RFC, the ALJ also considered the opinions of the state agency medical consultants who examined Claimant's medical records in December 2003 and again in September 2004 and completed physical RFC assessments. R. 54, 488-95. These doctors concluded that Claimant could perform a wide range of light work. *Id.* Claimant argues that the ALJ could not have reasonably considered the opinion of the medical consultants because their opinions were dated before two years of additional treatment and further surgery. However, the ALJ found the medical consultant's opinion that Claimant had the physical RFC to perform light work consistent with that of Dr. O'Keefe's, who performed the additional surgery and provided Claimant's treatment for the years following the state agency medical consultants' review. R. 45-50, 54.

Moreover, the ALJ considered the opinion testimony of the ME, an orthopedic specialist, who testified at the hearing that he believed Claimant was capable of performing a full range of light work. R. 54, 936. After reviewing Claimant's medical records, the ME failed to "find any anatomical basis for her physical complaints." R. 938-39.

Taken as a whole, the opinions of Dr. O'Keefe, the state agency medical consultants, and the ME, constitute substantial evidence which supports the ALJ's conclusion that

Claimant had the physical RFC to perform light work. No doctor opined otherwise.

However, although an ALJ's decision regarding a claimant's physical RFC is supported by substantial evidence, the ALJ must also explain her reasoning with enough detail and clarity to permit meaningful appellate review. *Brisco ex rel Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Claimant argues that the ALJ failed to build the logical bridge between the evidence and her conclusion that Claimant could perform light work. However, in this case the ALJ meticulously reviewed the evidence in the medical record and evaluated the opinion evidence she relied on in support of her physical RFC finding. R. 43-50, 54.

The ALJ also made a credibility finding when determining how much weight to give Claimant's self-reported symptoms. R. 55-58. An ALJ's credibility finding must be grounded in the evidence and articulated in her decision. SSR 96-7p; *Giles ex rel Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007). An ALJ should consider such factors as objective medical evidence, claimant's treatment history, and the type, dosage and side effects of any medication. 20 C.F.R. § 404.1529(c). An ALJ's credibility finding will not be disturbed unless it is patently wrong. *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993).

The ALJ conducted a thorough credibility determination which addressed specific inconsistencies between the record and Claimant's testimony and factored this into her evaluation of Claimant's claim of physical impairment. R. 55-58. The ALJ noted that the

medical record did not support Claimant's testimony or description of her constant severe pain, numbness or functional limitations, particularly regarding the use of her hands.  R. 58. Further, the ALJ pointed to the reports of the IME doctors and the FCE examiner which questioned Claimant's efforts and motivation to return to work.  R. 58, 616-37, 852-56.  In addition, the ALJ found inconsistencies in Claimant's efforts to fill prescription medications prescribed by her doctors, suggesting that Claimant's testimony and reports to her physicians about her continuing severe physical and emotional symptoms were less than credible.  R. 58.  Moreover, the ALJ considered the possibility that Claimant's WC claim could be adversely affecting her efforts to return to work.  *Id*.  The ALJ, therefore, adequately explained the basis for her credibility determination.

Thus, through her evaluation of the medical records, Claimant's testimony, and Claimant's credibility, the ALJ built a logical bridge between the medical record and her conclusion that Claimant had the physical RFC to perform light work.

## C.    The ALJ Had Substantial Evidence To Support Her Mental RFC Determination.

Claimant argues that the ALJ "played doctor" by improperly disregarding evidence from Claimant's treating physician, therapist, and psychiatrist which support a conclusion of greater mental impairment than that determined by the ALJ.  An ALJ must make a disability determination based on testimony and medical evidence in the record and "must be careful not to succumb to the temptation to play doctor."  *Rohan v. Chater*, 98 F.3d 966,

970 (7th Cir. 1996). An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's unqualified opinion. *See Murphy ex rel Murphy v. Astrue,* 496 F.3d 630, 634 (7th Cir. 2007).

In this case, however, the ALJ had substantial evidence from which a reasonable fact finder could conclude that Claimant had the mental RFC to perform and sustain simple, repetitive and unskilled work. Ms. Feliciano, Claimant's therapist, completed a post-hearing mental RFC assessment and attributed all of Claimant's limitations to physical injury and not to her depression or poor mental health. R. 17-22.

In addition, the ALJ points to therapy notes from Ms. Feliciano and Dr. Fisfalen, Claimant's treating psychiatrist, in which Claimant stated her depression was due to her unemployment and inability to work and her frustration with the progress of her disability and WC claims. R. 51-53, 542, 548, 569, 576-77, 582. Claimant complained primarily of pain during multiple visits with Dr. Fisfalen rather than discussing her depressed mood. R. 558-59, 564, 583. In April 2006, Ms. Feliciano assessed Claimant's GAF as 55, somewhat improved from her initial assessment of 45 - indicating a milder form of depression. R. 549. The ALJ also provided extensive detail about Claimant's prescription medication given by Dr. Fisfalen, and chronicled Claimant's failure to either fill those prescriptions or take them as ordered. R. 50-54.

The ALJ notes that she considered whether Claimant suffered from a somatoform

disorder, but found the record indicated otherwise. R. 58. The record supports her conclusion. Not one treating physician in the record states that Claimant is incapable of working because of her depression. On the contrary, Ms. Feliciano indicates in her mental RFC that Claimant's only limitations are due to her physical impairments. R. 17-22. In addition, Dr. O'Keefe, while believing Claimant to be "miserable," never stated that her mental health prevents her from working. R. 790-807.

Despite the substantial evidence supporting the ALJ's mental RFC determination, Claimant argues that the ALJ's determination is flawed because it did not include testimony of a mental health expert.[9] An ALJ has a duty to develop a claimant's medical record, and thus, may be required to consult medical advisors where the record appears to be incomplete. 20 C.F.R. § 404.1512; *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007). However, the primary responsibility of producing medical evidence of the severity of her impairment remains with the claimant. 20 C.F.R. § 404.1512(a); *Flener ex rel Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). Further, the ALJ's reasoned judgment as to how much evidence to gather should be respected because "it is always possible to identify one more test or examination an ALJ might have sought." *Flener*, 361 F.3d at 448.

---

[9]Although the ALJ was not aware until the hearing that Claimant's attorney had requested a mental health expert, the ALJ decided to defer the request until she received additional post-hearing records regarding Claimant's prescription medication and the findings from a completed mental RFC. R. 950-55. Upon receipt of the mental RFC assessment, completed by Claimant's treating therapist, Ms. Feliciano, the ALJ concluded that additional expert testimony regarding Claimant's mental health condition was unnecessary and thus closed the record. R. 38.

While testimony from a mental health expert might have provided additional guidance to the ALJ, given all of the current, reliable evidence in the record, the ALJ had a wealth of medical evidence from which to reasonably assess Claimant's mental RFC without further development with testimony from a mental health expert. Moreover, during the hearing the ALJ stated, in response to Claimant's request for testimony from a mental health expert, that "when there's so much treatment record, I still am going to rely more heavily on the treater than I am on the ME." R. 950. Furthermore, the ALJ took necessary steps to make sure the record was complete by asking for additional post-hearing documents, including Claimant's prescription records and a mental RFC assessment from Claimant's treater. R. 38. If an ALJ cannot reach a conclusion about whether a claimant is disabled, she must obtain additional evidence from treating sources, other examining sources, or ask for further consultative examinations. 20 C.F.R. § 404.1527(c). However, in this case the ALJ adequately developed the record and had substantial evidence for a reasonable mind to accept as adequate to determine Claimant's mental RFC.

The ALJ, therefore, properly evaluated the evidence in the record and built a logical bridge from the evidence to her conclusion that Claimant had the mental RFC to perform simple, repetitive unskilled work.

## IV.  CONCLUSION

**For the reasons set forth in this opinion, the Court affirms the ALJ's decision,**

28

denies Claimant's request for reversal or remand, and grants the Commissioner's motion for summary judgment.

SO ORDERED THIS 8TH DAY OF MARCH, 2010.


_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to**:

Michael J. McDonough
Law Office of Arthur S. Gomberg, P.C.
134 N. Lasalle Street
Suite 1208
Chicago, Illinois 60602

Counsel for Claimant

Ann L. Wallace
U.S. Attorney's Office
219 S. Dearborn Street
Suite 500
Chicago, Illinois 60604

Carole J. Kohn
Assistant Regional Counsel
200 W. Adams Street
Suite 3000
Chicago, Illinois 60606

Counsel for Defendant